IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHEILA GWINNER and HORST GWINNER, | HONORABLE JEROME B. SIMANDLE |
| Plaintiffs, | Civil No. 10-3001 (JBS/AMD) |
| v. | |
| MICHAEL MATT, et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Thomas Sacchetta, Esq.
SACCHETTA & BALDINO
Executive Center of Greentree
1 Eves Drive, Suite 111
Marlton, NJ 08056
    Attorney for Plaintiffs

Barbara J. Davis, Esq.
Jessica D. Wachstein, Esq.
MARSHALL, DENNEHY, MARSHALL, COLEMMAN & GOGGIN
200 Lake Drive
Suite 300
Cherry Hill, NJ 08002
    Attorneys for the Defendants

**SIMANDLE**, Chief Judge:

**I. INTRODUCTION**

This matter involving the alleged negligence of a motorist opening his car door on a roadway with a designated bike lane is before the Court on Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56(a). [Docket Item 17.] The principal issue to be determined is whether a dispute of fact

exists that Defendant breached a duty of care owed to Plaintiff when she collided with his car door as he was exiting his vehicle.  As will be explained at length below, the Court finds Plaintiff's negligence claim raises a question of material fact to be decided by a jury.  Plaintiff has also raised a dispute of fact that her alleged injuries are permanent and causally related to the accident for purposes of the limitation-on-lawsuit threshold of the New Jersey Automobile Insurance Cost Reduction Act, so Defendant's motion will be denied.

## II. BACKGROUND

Plaintiff, Sheila Gwinner, filed this lawsuit against Defendant, Michael Matt, based on an accident that occurred in June 2008, when Ms. Gwinner collided with Mr. Matt's car door while she was bicycling on Dune Drive in Avalon, New Jersey. Ms. Gwinner alleges Mr. Matt negligently opened his car door into the bike lane where she was traveling, striking her and causing her to suffer serious personal injuries.

On June 14, 2010, Plaintiff commenced a civil action against Defendant in the United States District Court for the District of New Jersey based on diversity jurisdiction under 28 U.S.C. § 1332(d).[1]  [Docket Item 1.]  According to Ms. Gwinner's Complaint, Mr. Matt's negligence consisted of, in part, "failing

---

[1] Both Plaintiffs are citizens of Pennsylvania, and Defendant is a citizen of New Jersey.  Compl. at ¶ 1.

to observe [her] bicycle on the bicycle path" and "failing to keep a reasonable lookout for other vehicles lawfully on the road."  Compl. at ¶ 12.  Ms. Gwinner then claims that, as a result of Mr. Matt's negligence, she suffered "severe and painful injuries," which required medical treatment, restricted her personal and work activities, and resulted in permanent injuries.  Id. at ¶ 13.

On the morning of June 15, 2008 Mr. Matt parked his vehicle in front of his father's house, in the parking lane along Dune Drive.  Matt Dep., Ex. F at 17:23-24.  At this location, Dune Drive is a four-lane roadway, two lanes north and two lanes south, with a bike lane and a parking lane.  Id. at 19:4-7. When Mr. Matt opened his door, he "heard a loud bang," and then observed a "young lady [] on the ground with her bicycle in front of the car to the left a little bit."  Id. at 28:5-8.  Ms. Gwinner was traveling at fifteen miles per hour along Dune Drive on the morning of the accident, and she did not observe Mr. Matt's vehicle prior to the collision.  Gwinner Dep., Ex. H at 34:5-10.  Additionally, Ms. Gwinner testified that, when the accident occurred, she was riding within the bike lane (id. at 34:20-21); however, she did not observe and does not know whether Mr. Matt's car door actually extended into the bike lane.  Id. at 40:7-13.

Ms. Gwinner carries automobile insurance provided by
Progressive Insurance, an insurance company authorized to
conduct business in the State of New Jersey.  She alleges that
as a result of the accident, she suffered "traumatic multi level
disc herniation/protrusion/radiculopathy, traumatic right knee
fracture/contusion/anterior horn tear, and traumatic right
hand/thumb tendonitis with radial/median nerve neuritis and
joint inflammation." Compl. at ¶ 13.[2]  Plaintiff claims that
these injuries demonstrate a "permanent injury" as set forth in
the New Jersey Automobile Insurance Cost Reduction Act ("AICRA")
at N.J. Stat. Ann. § 39:6A-8(a) and that she has produced
sufficient objective medical evidence to support her claim.
Pl.'s Opp'n Br. at 4.

In the present motion, Defendant argues that he is entitled
to summary judgment because Plaintiff has failed to "establish
proof a negligence claim as a matter of law." Def.'s Br. in
Supp. Summ. J. at 2.  Specifically, Defendant argues Plaintiff
has failed to establish the alleged breach of duty, as she
"produced no evidence that Mr. Matt's car door extended into the
bike lane." Id. at 3.  Defendant also argues that Plaintiff is

---

[2] Plaintiff includes a medical report in support of this
allegation.  Pl. Ex. D.

4

barred from pursuing noneconomic damages[3] because she has failed to produce objective medical evidence demonstrating she suffered permanent injuries, as a result the accident in question, to her neck, right knee, and right wrist. Id. at 15-16.

For the following reasons, the Court finds Plaintiff has sufficiently raised a question of material fact regarding her breach of duty claim; Defendant's motion is denied on this issue. Additionally, the Court finds Plaintiff has provided sufficient objective medical evidence from which a reasonable jury could conclude that she suffered permanent injuries as a result of the accident; therefore, Plaintiff has met AICRA's limitation-on-lawsuit threshold, and Defendant's motion is denied.

**III. DISCUSSION**

**A. Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

---

[3] "Noneconomic damages" are defined by statute as "pain, suffering and inconvenience." N.J. Stat. Ann. § 39:6A-2i. By contrast, "economic loss" is defined as "uncompensated loss of income or property, or other uncompensated expenses, including, but not limited to, medical expenses." Id. at § 39:6A-2k. The Court notes that Plaintiff appears to claim only noneconomic losses. Additionally, Defendant requests dismissal of Plaintiff's claim in its entirety, not just dismissal of Plaintiff's claim for noneconomic losses. Plaintiff does not refute this by presenting economic losses and arguing that, should the Court find in Defendant's favor, her claims for economic losses must survive. Therefore, dismissal is the result of finding for Defendant.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact. Fed. R. Civ. P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993). However, the Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party. Hunt v. Cromartie, 526 U.S. 541, 552 (1999). Where the nonmoving party bears the burden of persuasion at trial, the moving party may be entitled to summary judgment merely by showing that there is an absence of evidence to support an essential element of the nonmoving party's case. Fed. R. Civ. P. 56(c)(1)(B); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

**B. Summary Judgment as to Plaintiff's Negligence Claim**

Under New Jersey law, for a plaintiff to establish a negligence claim she must show that the defendant "breached a duty of reasonable care, which constituted a proximate cause of the plaintiff's injuries." Brown v. Racquet Club of Bricktown, 95 N.J. 280, 288, 471 A.2d 25, 29 (1984). Furthermore,

"negligence must be proved and will never be presumed, [] indeed there is a presumption against it, and [] the burden of proving negligence is on the plaintiff."  Buckelew v. Grossbard, 87 N.J. 512, 525, 435 A.2d 1150 (1981) (citing Hansen v. Eagle-Picher Lead Co., 8 N.J. 133, 139, 84 A.2d 281 (1951)).

Plaintiff claims Defendant acted negligently when he opened his car door "into the bike lane where [she] was operating her bicycle."  Pl.'s Opp'n Br. 2.  She also alleges she suffered injuries as a result of Defendant's negligence.  Id.

Defendant argues Plaintiff has failed to present a valid negligence claim because she has not alleged a breach of duty that was the proximate cause of her injuries.  Def.'s Br. in Supp. Summ. J. 2.  Defendant argues Plaintiff has not produced evidence showing his car door entered into or obstructed the bike lane.  Id. at 3.  Defendant also claims the evidence shows Ms. Gwinner was solely responsible for her injuries because she was riding her bicycle outside of the bike lane when she collided with his car door.  Id.  To support this claim, Defendant argues that after the accident, he fully opened his door to see if it extended into the bike lane, which, he claims, it did not.  Id. at 1.

1. Duty of Care

Neither party has addressed the existence of a duty of care in the instant case.  Because the existence of a duty is

7

essential to all negligence claims, however, the Court must
tackle the issue.

"The question of whether a duty to exercise reasonable care
to avoid the risk of harm to another exists is one of fairness
and policy that implicates many factors." Carvalho v. Toll
Bros. and Developers, 143 N.J. 565, 573, 675 A.2d 209, 212.
(citing Dunphy v. Gregor, 136 N.J. 99, 110, 642 A.2d 372
(1994)).  Foreseeability is the first factor considered, as it
is "the predicate for the duty to exercise reasonable care."
Id. at 573.  While foreseeability is needed to determine whether
a duty of care exists, it is not the only factor.  Id. at 572.
Courts also consider fairness and policy factors such as "the
relationship of the parties, the nature of the attendant risk,
the opportunity and ability to exercise care, and the public
interest in the proposed solution." Id. at 573 (quoting Hopkins
v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110.
(1993)).

The Court will first address foreseeability. Mr. Matt was a
resident of Avalon, who was aware of the existence of the bike
lane along Dune Drive, and who had used the Dune Drive bike lane
prior to the accident in question.  Matt Dep., Ex. F at 9:20;
20:16-19, 22-23; 21:1-2.  Mr. Matt was also aware that the Dune
Drive bike lane was regularly used during the summer months,
Avalon's tourist season.  Id. at 46:3-7.  The risk of harm posed

by a collision between a cyclist and an automobile, or
automobile door, is obvious. As a result, where bicycles and
motor vehicles are in close proximity, the risk of harm
presented by obstructing or entering into the bike lane, or,
more generally a bicyclist's lane of travel, was clearly
foreseeable to Mr. Matt at the time of the accident.

"Once the foreseeability of an injured party is
established, ... considerations of fairness and policy govern
whether the imposition of a duty is warranted." Carvalho at
573, 675 A.2d at 212 (quoting Carter Lincoln Mercury, Inc. v.
EMAR Group, Inc., 135 N.J. 182, 194-95, 638 A.2d 1288 (1994)).
In Carvalho, a construction worker was killed when trench walls
collapsed on him.  Id. at 571-572, 675 A.2d at 212.  In a suit
against the site engineer, the New Jersey Supreme Court, after
determining the risk of harm was foreseeable, held that imposing
a duty of care on the engineer was warranted because there was a
contractual relationship between the parties; the engineer was
responsible for monitoring work progress, which implicated
worksite safety; the engineer had control to change work
conditions; and the engineer had actual knowledge of the
dangerous condition because other trench walls had collapsed at
the site.  Id. at 575-578, 675 A.2d at 214-15.

Here, Mr. Matt and Ms. Gwinner had no prior existing
relationship. In fact, their first actual encounter occurred

after Ms. Gwinner had already collided with Mr. Matt's car door. Matt Dep., Ex. F at 28:4-15; Gwinner Dep., Ex. H at 37:4-10. Additionally, Mr. Matt had never previously been involved in an automobile accident involving a bicyclist.   Ex. F at 46:12-16. But their relationship was a functional one: both were using vehicles on the limited roadway space of a public thoroughfare. Imposing a duty of care on Mr. Matt in terms of obstructing or otherwise interfering with a bicyclist's lane of travel is fair as a matter of public policy.   The City of Avalon has created bike lanes presumably to promote bicycling generally and as an attempt to attract visitors.   The explicit purpose of a bike lane is to minimize the risks inherent in roadways that accommodate automobiles, bicycles, and pedestrians by providing bicyclists an exclusive lane of travel.   Finally, imposing a duty of care in terms of keeping a proper lookout before crossing, entering into, or otherwise obstructing a bicyclists' lane of travel does not unduly burden motorists.   At most, this duty requires a driver to ensure his automobile is parked fully in the parking lane and to check his review mirrors, or otherwise look out for bicyclists, prior to opening his car door and exiting his vehicle.

In conclusion, the possibility of a collision between a cyclist and a car or car door on roadways shared by cyclists and motorists, is foreseeable.   Moreover, the public interest in

10

promoting bicycle safety and the minimal burden placed on motorists to exercise reasonable care can lead only to the conclusion that Mr. Matt owed Ms. Gwinner a duty of care when parking and exiting his vehicle along Dune Drive.

    2. <u>Breach of Duty</u>

Because breach of duty is an essential element of a negligence claim, facts relating to a defendant's breach are material to the success of the claim. In the instant case, the material fact regarding breach of duty is whether Defendant Matt's car door entered into the bike lane, causing the collision.  Because Ms. Gwinner has the burden of proving negligence at trial, Mr. Matt would be "entitled to summary judgment merely by showing that there is an absence of evidence" supporting Ms. Gwinner's negligence claim.  <u>Celtotex Corp.</u> at 325.  The Court finds Plaintiff has minimally succeeded in providing evidence to support her claim that Defendant breached a duty of care.

Ms. Gwinner alleges Mr. Matt breached the duty by negligently opening his car door into the bike lane, causing her to collide with the door and suffer injuries.  Mr. Matt claims Ms. Gwinner has failed to produce evidence his car door entered the bike lane. Mr. Matt also claims the evidence in the record shows that Ms. Gwinner was actually the sole cause of the collision and her injuries because his car door did not extend

into the bike lane, so, he infers, Ms. Gwinner must have been
riding her bicycle in the parallel parking lane at the time of
the accident.

The evidence in the record pertaining to Plaintiff's
negligence claim is scant. There were no witnesses to the
accident, aside from Mr. Matt and Ms. Gwinner.  Matt Dep., Ex. F
at 35:5-7; Gwinner Dep., Ex. H at 44:14-15.  Neither Mr. Matt
nor Ms. Gwinner took photographs or made measurements of the
accident scene; more specifically, there are no photographs[4] or
measurements relating to the distance of Mr. Matt's passenger
side tires from the curb or how far Mr. Matt's car door extended
when opened on the day of the incident.  Matt Dep., Ex. F at
37:22-24, 38:1-2; Gwinner Dep., Ex. H at 47:1-5.  Finally,
though both parties independently visited the Avalon Police
Station after the accident, no police report was produced.  Matt

_____

[4] There is photographic evidence of Dune Drive at the accident
site as of February 2011. While the photographs tell us little
about the actual scene of the accident in June 2008, they do
confirm that a Honda Accord parked close enough to the curb in
the parking lane can fully open its driver side door without the
door entering into the bike lane. However, the photographer used
a Honda Accord to make this demonstration.  Ex. G.  On the day
of the accident, Mr. Matt was driving a Cadillac CTS.  Ex. F at
23:5-6.  Car width and door length vary from make to make and
model to model; as a result, the Court notes that Defendant's
photographs are of limited value on the relevant question of
whether Mr. Matt's Cadillac could similarly park in the parking
lane and fully open his car door without obstructing the bike
lane.  The demonstrative Honda exhibit's materiality also
depends upon how close to the curb Defendant's vehicle was
parked at the time of the accident.

Dep., Ex. F at 43:19-22, 44:1-3; Gwinner Dep., Ex. H at 70:13-15, 71:18-21.

Ms. Gwinner's recitation of what she remembers from the date of the accident is also meager.  Though she claims to have been riding in the bike lane along the right side of the lane, at no time before, during or after the accident did she observe Mr. Matt's car door extending into the bike lane.[5]  Gwinner Dep., Ex. H at 34:8-10, 40:7-10, 19-23.  Additionally, she did not observe and does not know how close to the curb Mr. Matt parked his car.  Id. at 48:2-5.

However, Ms. Gwinner's deposition testimony describing the accident is sufficient to demonstrate the existence of a question of material fact, which should be decided by a jury. She states, "Is all I know I was [sic] riding my bike. And the poor man was as startled as I was. The door started opening and I just went into it."  Id. at 34:6-10.  When Ms. Gwinner's description of the accident is considered along with her testimony that she was riding her bike within the bike lane when she collided with Mr. Matt's car door (id. at 36:15-17), a fact

---

[5] During her deposition, Ms. Gwinner participated in the following exchange with Defense attorney Barbara J. Davis:
      Q: But did you see at all how far the car door extended
      out?
      A: No, I didn't.
      Q: As you sit here today, do you know if the car door
      extended out into the bike lane, Mr. Matt's car door?
      A: I don't.

finder could reasonably infer Mr. Matt's car door must have entered the bike lane and caused the collision, and choose to believe Ms. Gwinner's account of the accident rather than Mr. Matt's.

Because all reasonable inferences must be given to the nonmovant, the Court finds Ms. Gwinner has raised a genuine issue of material fact as to whether Mr. Matt breached a duty of care by negligently opening his car door into a bicyclist's lane of travel, or otherwise failing to reasonably look out for bicyclists before exiting his vehicle.  Therefore, Mr. Matt has failed to meet the summary judgment standard set forth under Fed. R. Civ. P. 56(c)(1)(B) and Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) and his motion will be denied as to Plaintiff's negligence claim.

**C. Summary Judgment as to Plaintiff's Inability to Satisfy AICRA's Limitation-on-Lawsuit Threshold**

    1. The Applicability of the New Jersey's "Deemer Statute" and AICRA

Because Ms. Gwinner is insured by Progressive Insurance, an insurance company authorized to conduct business in the State of New Jersey, Defendant argues, and Plaintiff does not dispute, Plaintiff is subject to New Jersey's "Deemer Statute" and the "limitation-on-lawsuit threshold" set forth in AICRA.

14

The Deemer Statute, N.J. Stat. Ann. § 17:28-1.4, "requires insurers authorized to transact automobile insurance business in New Jersey to provide coverage to out-of-state residents consistent with New Jersey law 'whenever the automobile or motor vehicle insured under the policy is used or operated in this State.'" Zabilowicz v. Kelsey, 200 N.J. 507, 513-514, 984 A.2d 872, 875-876 (2009).  The Deemer Statute also requires affected insurance companies "to provide personal injury protection [("PIP")] benefits pursuant to N.J. Stat. Ann. [§] 39:6A-4." Id. at 514, 984 A.2d at 876.  "In short, the Deemer Statute furnishes the covered out-of-state driver with New Jersey's statutory no-fault PIP and other benefits and, in exchange, deems that driver to have selected the limitation-on-lawsuit option of [N.J. Stat. Ann. §] 39:6A-8(a)." Id.  Because Plaintiff conceded to Defendant's assertion that Plaintiff is subject to the limitation-on-lawsuit threshold via the Deemer Statute, even though Plaintiff was riding her bicycle rather than driving an automobile at the time the accident, the Court assumes that the Deemer Statute applies to the facts of this case.

AICRA represents an effort by the New Jersey's Legislature to curb rising auto insurance costs by limiting the opportunities for accident victims to sue for noneconomic damages. This effort began with New Jersey's implementation of a

15

no-fault insurance scheme in 1972 when New Jersey passed the New Jersey Automobile Reparation Act and has since undergone numerous revisions, in a process described as "tortured," which need not be recounted here. See, e.g., Branca v. Matthews, 317 F. Supp. 2d 533, 537-539 (D.N.J. 2004). The New Jersey Legislature passed AICRA in 1998 with three distinct goals "containing [insurance premium] costs, rooting out fraud within the system, and ensuring a fair rate of return for insurers." DiProspero v. Penn, 183 N.J. 477, 488, 874 A.2d 1039, 1046 (2005).

### 2. The Limitation-on-Lawsuit Threshold

To contain automobile insurance costs, AICRA established the limitation-on-lawsuit threshold, which "bars recovery for pain and suffering unless the plaintiff suffers an injury that results in (1) death; (2) dismemberment; (3) significant disfigurement or significant scarring; (4) displaced fractures; (5) loss of fetus; or (6) permanent injury within a reasonable degree of medical probability ...." Id. (quoting N.J. Stat. Ann. § 39:6A-8(a))(internal quotation marks omitted).

An insured bound by the limitation-on-lawsuit threshold is barred from suing for noneconomic damages unless her injuries fall within AICRA's six categories. Johnson v. Scaccetti, 192 N.J. 256, 261, 927 A.2d 1269, 1273 (2007). In the summary judgment context, a plaintiff can proceed to trial if she

16

demonstrates that her alleged injuries, if proven, fall into one of the six threshold categories.  Davidson v. Slater, 189 N.J. 166, 187, 914 A.2d 282, 295 (2007) (citing Oswin v. Shaw, 129 N.J. 290, 294, 609 A.2d 415, 417 (1992)).  A plaintiff must also prove that the alleged statutory injury was caused by the accident in question or "risk dismissal on summary judgment if the defendant can show that no reasonable fact-finder could conclude that the defendant's negligence caused plaintiff's alleged ... injury."  Id. at 188, 914 A.2d at 295.  However, where, as here, a plaintiff alleges she suffered more than one injury as a result of the accident in question, the plaintiff need only establish one of her injuries meets the limitation-on-lawsuit threshold for the jury to consider all of the injuries when calculating noneconomic damages.  Johnson at 279, 927 A.2d at 1282.

### 3. Permanent Injury

AICRA defines "permanent injury" as "[w]hen the body part or organ, or both, has not healed to function normally and will not heal to function normally with further medical treatment." N.J. Stat. Ann. 39:6A-8(a).  Additionally, in adopting AICRA, the New Jersey Legislature explicitly adopted a threshold requirement, the objective medical evidence standard, established by the New Jersey Supreme Court in Oswin v. Shaw, 129 N.J. 290, 609 A.2d 415 (1992).  DiProspero v. Penn, 183 N.J.

477, 495, 874 A.2d 1039, 1050 (2005).  A plaintiff's alleged
limitation-on-lawsuit injury "must be based on and refer to
objective medical evidence."  Id. (emphasis removed).

Plaintiff claims her neck, right wrist, and right knee
injuries are permanent injuries within the meaning of AICRA. See
supra pp. 4-5.  Additionally, Ms. Gwinner claims the medical
report created by Dr. James F. Bonner, her physical therapy
physician (Pl.'s Opp'n Br., Ex. D), "sets forth his opinion
within a reasonable degree of certainty as to the permanency of
[her] injuries and their relatedness to the accident"; as such,
she has satisfied the limitation-on-lawsuit threshold.  Pl.'s
Opp'n Br. 4.

Mr. Matt argues that Ms. Gwinner has failed to produce
objective medical evidence demonstrating she suffered permanent
injuries, as a result the accident in question, to her neck,
right knee, and right wrist.  Def.'s Br. in Supp. Summ. J. at
11.  First, Defendant claims Dr. Bonner's report shows that Ms.
Gwinner had a pre-existing cervical injury and that the report
fails to present evidence showing Ms. Gwinner's cervical
condition is causally connected to the accident.  Id. at 11-12.
Second, Defendant argues Plaintiff's alleged knee injuries fail
to meet the threshold because there is evidence of pre-existing
injuries and surgeries, a failure to connect the injuries to the
accident, and Plaintiff "has testified she has full use of her

18

right knee and is not restricted in any of her physical activities." Id. 12-14.  Finally, Defendant claims Plaintiff has not presented objective medical evidence of a permanent injury to her right wrist because the medical reports show that she had been treated for right wrist problems prior to the accident and that the reports alleging a right wrist injury after the accident are based on Ms. Gwinner's subjective complaints and not objective medical testing.  Id. at 14-15.

Because Ms. Gwinner need only demonstrate that one of her injuries, if proven, is permanent under AICRA's definition, the Court will evaluate each alleged injury individually. First, however, the Court will address Defendant's broader assertion that Plaintiff's claim should be dismissed because she did not provide a comparative analysis distinguishing the injuries allegedly caused by the accident from other, preexisting injuries, as required by Davidson v. Slater, 189 N.J. 166, 914 A.2d 282 (2007).  In Davidson, The New Jersey Supreme Court did not create a blanket rule. Instead, it held,

> When a plaintiff alleges aggravation of preexisting
> injuries as the animating theory of the claim, then
> plaintiff must produce comparative evidence to move
> forward with the causation element of that tort
> action. When a plaintiff does not plead aggravation of
> preexisting injuries, a comparative analysis is not
> required to make that demonstration.

189 N.J. at 179, 914 A.2d at 284.  The New Jersey Supreme Court then cautioned plaintiffs with preexisting injuries not required

to provide such a report, stating, "[T]he plaintiff who does not prepare for comparative medical evidence is at risk of failing to raise a jury-worthy factual issue about whether the subject accident caused the injuries."  Davidson, at 188, 914 A.2d at 295.

As was the case in Davidson, Plaintiff Gwinner has not explicitly alleged that her injuries were aggravations of preexisting injuries.[6]  The only medical report provided by Ms. Gwinner to support her claim that she suffered permanent injuries as a result of the accident, however, makes no mention of new injuries.  Pl. Ex. D.  Instead, the one-page report prepared in 2009 by Dr. Bonner states Ms. Gwinner had previous injuries or previously received medical treatment to the alleged injured areas and that she suffered "advanced impairment ... as a direct result of her 6/15/08 trauma."  Id.  Moreover, the report specifically mentions Plaintiff's "old knee problem" and concludes the accident caused "a higher pain/dysfunction level." Id.  While this report might appear to indicate all of Plaintiff's alleged injuries are exacerbations, Dr. Bonner produced a more detailed report on July 1, 2008, on which the

---

[6] Plaintiff did not allege her injuries were either new or exacerbations of previous injuries and conditions; she was silent on this issue.  Compl. at ¶ 13.  However, Plaintiff's allegations regarding her injuries appear to be direct quotes from Dr. Bonner's 2009 report. See supra. p. 4. and note 2.

2009 report partially relies.[7]  Reviewing the medical reports
referenced in Dr. Bonner's report reveals some of the injuries
described are in fact new injuries.

When considering Ms. Gwinner's complaint and supporting
evidentiary documents, it is clear some of her alleged injuries
are aggravations of previously existing injuries and medical
conditions.  But because she has not alleged aggravation
injuries in her Complaint, she is not required to provide a
comparative report to support the causation element of her tort
claim.  The New Jersey Supreme Court's warning in Davidson,
however, is pertinent to the instant case because the lack of a
comparative analysis has clouded the Court's effort to properly
evaluate whether Plaintiff provided sufficient evidence of
causation.  Nevertheless, the surplus of medical reports
provided has allowed the Court to satisfactorily investigate
which alleged injuries are sufficiently supported by evidence of
causation and which are not.

a.  Cervical Injury

Though Ms. Gwinner claims to have suffered permanent injury
in the form of traumatic multi level disc herniation,
protrusion, and radiculopathy, there is no evidence suggesting

---

[7] In addition to his July 1, 2008 report, Dr. Bonner also
referenced a July 9, 2008 report created by Dr. Philip S. Yussen
of Mainline Open MRI (Def. Ex. I).  Both reports discuss new
injuries Ms. Gwinner suffered as a result of the accident.  See
infra pp. 23-26.

the alleged injuries are permanent. First, Ms. Gwinner had an MRI done in 2007, prior to the accident, because she was experiencing pain in her neck dating back to 2000. Gwinner Dep., Ex. H 13:15-21, 14:15-23. At the request of Dr. Bonner, Ms. Gwinner received another MRI in July 2008. The report written by Dr. Philip S. Yussen states, "Current examination demonstrates the cervical vertebral bodies to maintain normal stature. There is partial straightening of the cervical lordosis, which may be related to patient positioning, muscle spasm, or even a chronic finding *given that this was evident on the previous MRI study as well*." Def. Ex. O (emphasis added). The report goes on to conclude,

> There has not been a significant change in the MRI appearance of the cervical spine as compared to the previous MRI study of 8/9/07. The previously noted fatty marrow island at C7 and small low signal presumed development focus at C5 right of midline are again noted, and are stable. No new osseous abnormalities are seen referable to the cervical vertebrae as compared to the previous study.

Id. Dr. Yussen's report can only be read to state that the condition of Ms. Gwinner's neck has not changed, let alone deteriorated, as a result of the accident.

Additionally, Defendant's medical expert, Dr. Brian K. Zell examined Ms. Gwinner in May of 2011, two years after the medical report provided by Plaintiff, and produced a report (Def. Ex. N). According to Dr. Zell, Ms. Gwinner

suffered from a preexisting degenerative disease of the cervical spine, and "[t]he automobile accident in question is not considered a responsible event for the progression of preexisting degenerative changes in the cervical spine." Def. Ex. N. at 17.  Ms. Gwinner has not offered any evidence to rebut these findings. As a result, Plaintiff's cervical injury cannot serve as a basis for her noneconomic claims. See Kauffman v. McCann, Civ. No. 05-3687, 2007 WL 1038696 at *4 (D.N.J. March 29, 2007) ("Because it is plaintiff's burden at trial to show Defendant caused her permanent injuries within the meaning of AICRA, Plaintiff may not merely rest on her pleadings once Defendant has come forward with evidence tending to show that Plaintiff is not suffering permanent injury.").  Plaintiff has offered no evidence raising a dispute of fact that, since at least 2008, she has suffered from any spinal injury caused by the 2008 accident.

       b.  Right Knee Injury

     Plaintiff also claims her "traumatic right knee fracture/contusion/anterior horn tear" constitutes a permanent injury under AICRA. The evidence in the record is very close as to whether Ms. Gwinner's right knee injuries are permanent;

however, there is insufficient evidence demonstrating the injuries are causally related to the accident.

Ms. Gwinner underwent medial meniscus surgery to her right knee in 1999. Gwinner Dep., Ex. H 8:23-24, 9:1-4. After the accident, Ms. Gwinner was first evaluated Dr. Bonner on July 1, 2008. Regarding Ms. Gwinner's right knee, Dr. Bonner wrote, "Her past medical history is remarkable for a medical meniscetomy seven years ago for which she recovered had not had problems involving the right knee." Def. Ex. K. Dr. Bonner then concluded that, "as a direct result of the accident," Ms. Gwinner suffered a "contusion to the distal one third of the medial subcutaneous surface of the tibia." Id. Thus, Dr. Bonner's initial evaluation attributed only a contusion to the accident in question.

 Eight days later, Ms. Gwinner received an MRI and evaluation at Main Line MRI. In a report dated July 9, 2008, Dr. Philip S. Yussen also noted symptoms consistent with "mild strain or subtle contusion." Def. Ex. I. Dr. Yussen further noted that the MRI revealed there were no tears to the posterior cruciate ligament, anterior cruciate ligament, or medial collateral ligament. Id. Additionally, "no lateral meniscal tear or significant degenerative signal change" was apparent. Id. Finally, while Dr. Yussen's examination did reveal "free edge blunting of the posterior horn region" as well as some

"small" tears in the medial meniscus region, he was unable to determine the cause of these injuries.  Id.  He stated, "Given the provided history, the appearance may in part be related to previous partial meniscus tear."  Id.

An orthopaedic surgeon, Dr. Marc S. Zimmerman, then evaluated Ms. Gwinner's right knee. In a report dated July 28, 2008, Dr. Zimmerman stated, "[Ms. Gwinner's] right knee gives out on her.  She denies popping and clicking. She does not think it is swollen at this time." Def. Ex. J at 1.  Dr. Zimmerman described his evaluation of Ms. Gwinner's right knee as follows:

> Evaluation of the right knee reveals no swelling or
> effusion.  She has full range of motion without pain.
> There is minimal tenderness over the lateral joint
> line with no tenderness over the medial joint line.
> On the McMurray's test on internal rotation, there is
> a click appreciated over the lateral joint line.
> There is a negative Lachman's test.  There is no
> varus/vulgus laxity.

Id. at 2.  Dr. Zimmerman found there "appear[ed] to be a tear in the posterior horn of the medial meniscus," but concluded the possible tear was "most likely related to the previous surgery and injury."  Id.  As with the two previous evaluations, Dr. Zimmerman noted a bone contusion "at the lateral plateau in the anterolateral aspect."  Id.

In conclusion, because Plaintiff has failed to provide a comparative analysis detailing her previous right knee injuries and then distinguishing any preexisting conditions from the

injuries she allegedly suffered as a result of the accident in question, the Court is only able to find causation with regards to the bone contusion. This injury was consistently reported in all three medical evaluations conducted in 2008 and was the only injury explicitly connected to the accident. However, this injury cannot be considered permanent.  Plaintiff's medical report was prepared on December 16, 2009.  Regarding Ms. Gwinner's right knee, the report merely states, "She also injured her right knee."  It then concludes Ms. Gwinner suffered "traumatic right knee fracture/contusion/anterior horn tear." Defendant's medical expert, Dr. Zell, examined Ms. Gwinner's right knee approximately one-and-a-half years later in May 2011. This represents the most recent evaluation of Ms. Gwinner's right knee.  Dr. Zell noted that the MRI taken by Main Line MRI in 2008 revealed a contusion, but concluded that as of May 2011, the right knee "is entirely within normal limits ... [and] further intervention with respect to the patient's right knee as a consequence of the bicycle versus automobile collision is not warranted."  Def. Ex. N. at 17.

Again, Plaintiff has not offered any evidence to rebut the evidence offered by Defendant showing Plaintiff's right knee is within normal limits and does not require further treatment. Moreover, Plaintiff offers no additional evidence permitting the reasonable inference that the right knee contusion is permanent.

Therefore, it is insufficient to support a claim for noneconomic damages under AICRA.

### c.  Right Wrist Injury

Ms. Gwinner alleges that, as a result of the accident, she suffered traumatic right hand/thumb tendonitis with radial/median nerve neuritis and joint inflammation.  After reviewing the many doctors' reports discussing Ms. Gwinner's right wrist, the Court finds Ms. Gwinner has successfully demonstrated that, if proven, these injuries constitute a causally related permanent injury with the meaning of AICRA.

Dr. Bonner was the first medical professional to evaluate Ms. Gwinner's wrist after the June 2008 accident. On July 1, 2008, Dr. Bonner wrote that Ms. Gwinner reports "numbness in the right thumb, index finger, and long finger primarily on the tip." Def. Ex. K.  Dr. Bonner then noted Ms. Gwinner had been previously treated for numbness in her right hand and that she stopped treatment in November 2007, prior to the accident.  Id. Relevant to causation, this report stated, the "condition had resolved until following this accident." Id.  Dr. Bonner also found "positive phalen's[8] and tinel's sign[9] [sic] at the right

---

[8] Dorland's Illustrated Medical Dictionary 1714 (Elsevier Saunders 32nd ed. 2012) defines "Phalen sign" as the "appearance of numbness or paresthesias within 30 to 60 seconds during the Phalen test, a positive sign for carpal tunnel syndrome." A Phalen sign is detected by performing a Phalen test, which is a "[a] test for carpal tunnel syndrome. The patient flexes the

wrist with tenderness over the ... carpal metacarpal joint of
the thumb." Id.  The report concludes that "as a direct
result" of the accident in question Ms. Gwinner's right wrist is
indicative of "[p]ost traumatic sprain of the carpal/metacarpal
joint of the right thumb with carpal tunnel syndrome being
evident." Id.

   Dr. Zimmerman also evaluated Ms. Gwinner's right wrist
during her July 28, 2008 visit because she reported "some
numbness and tingling in the thumb and second finger of her
right hand." Def. Ex. J.  Dr. Zimmerman's report sheds light on
the issues of previous existing injuries and causation. He
states that while Ms. Gwinner's past medical history includes
numbness and tingling in her right hand, that condition "had
resolved but is now present again ... since the most recent

_____

wrist for 1 minute. Carpal tunnel syndrome is confirmed if the
patient experiences a tingling that radiates into the thumb,
index finger and the middle and lateral half of the ring
finger." Volume 4 M-PQ, J.E. Schmidt, M.D., Attorney's
Dictionary of Medicine P-208 (Matthew Bender). In light of these
definitions, the Court interprets positive Phalen sign to
represent that carpal tunnel syndrome was detected.

[9] Dorland's Illustrated Medical Dictionary 1716 (Elsevier
Saunders 32nd ed. 2012) defines "Tinel sign" as "a tingling
sensation in the distal end of a limb when percussion is made
over the site of a divided nerve. It indicates a partial lesion
or the beginning regeneration of the nerve." The Court thus
interprets Positive Tinel sign to indicate possible presence of
a lesion(s) in the tested area.

accident." Id.  Moreover, an EMG was performed on Ms. Gwinner

in 2007, and "she was told there was no permanent damage." [10]

In December of 2008, Ms. Gwinner visited Dr. William H.

Kirkpatrick of Hand Surgical Associates.  Def. Ex. L.  In his

report, Dr. Kirkpatrick similarly noted, "[Ms. Gwinner] had

approximately six months of tingling in the thumb, index and

long fingers before her bike accident for which she was treated

by a chiropractor" but that the symptoms resolved prior to the

June 2008 collision.  Id.  Dr. Kirkpatrick saw no swelling in

the right wrist, full active range of motion, and no tenderness.

However, the report found positive Tinel signs "over the

superficial radial nerve several centimeters proximal to the

wrist" and ultimately diagnosed Ms. Gwinner with right

"superficial radial nerve neuritis, probably right median

neuritis, and right thumb joint CMC joint inflammation."  Id.

This report also noted that Ms. Gwinner's right wrist injuries

were her "primary concern." Id.

The Court finds the reports of Dr. Bonner, Dr. Zimmerman

and Dr. Kirkpatrick sufficient to demonstrate that while Ms.

Gwinner had experienced some numbness and tingling prior to the

June 2008, that condition had ceased and was deemed nonpermanent

prior to the accident.  Because both Dr. Bonner and Dr.

---

[10] It should be noted, however, that Dr. Zimmerman determined
there were "negative Tinel's and negative Phalen's signs."  Def.
Ex. J.

Zimmerman's reports noted positive Phalen and Tinel signs, among other injuries, a reasonable fact finder could determine that any injuries found in Ms. Gwinner's right wrist in these post-accident reports are causally connected to the June 2008 collision.  Therefore, Ms. Gwinner has sufficiently demonstrated causation.

Dr. Bonner's December 16, 2009 report and Dr. Zell's May 31, 2011 report are relevant to the Court's inquiry into the permanency of Ms. Gwinner's alleged right wrist injuries. Dr. Bonner's 2009 report described Ms. Gwinner's injuries as "traumatic right hand/thumb tendonitis with radial/median nerve neuritis and joint inflammation." Pl. Ex. D.  The report stated these injuries have resulted in "permanent restriction to no impact forces to those affected areas." Id.

Again, the Defendant's medical expert, Dr. Zell, was the last doctor to evaluate Ms. Gwinner's right wrist. As of May 2011, Ms. Gwinner's still complained of tightness and numbness in her right wrist.  Def. Ex. N. at 5.  Dr. Zell found, "The bicycle versus automobile collision in question has a chronological association with ongoing complaints referable to the median nerve at the right wrist." Id.  And while he found "the absence of a Tinel at the carpal tunnel on the right side," Dr. Zell did not entirely rule out carpal tunnel syndrome,

concluding, "If this patient does in fact have a carpal tunnel syndrome, it is subclinical." Id.

There is substantially more evidence regarding Ms. Gwinner's alleged right wrist injury. While some of the medical reports seem to contradict each other, particularly in regard to Phalen and Tinel signs, all reasonable inferences must be given to the nonmovant.  Thus, the Court finds Plaintiff has provided evidence sufficient for a reasonable fact finder to determine her right wrist injuries are permanent and causally connected to the June 2008 accident.

Defendant's final argument in support of his motion for summary judgment is that Ms. Gwinner's deposition testimony indicates "she does not have any physical restrictions or limitations."   Def.'s Br. in Supp. Summ. J. at 15. Defendant claims Ms. Gwinner experiences no restrictions in her ability to "perform all of her household chores, go[] skiing, and ... ride her bike approximately 50 miles." Id.  While Ms. Gwinner did state she did not miss any time from work as a result of the accident (Gwinner Dep., Ex. H 7:12-14) and she is able to conduct her life somewhat normally, Defendant has not provided a full picture of Ms. Gwinner's statements.  Regarding her ability to perform household chores, Ms. Gwinner participated in the following exchange:

> Q: Are you able to do all your household chores?
>
> A: I can do almost everything I that want. It's—I'm losing dexterity in this hand because of numbness.
>
> Q: Indicating your right hand?
>
> A: Yes. Like I have good strength it in to go like this.
>
> Q: To make a fist?
>
> A: To make a fist. And if you put your hand, I can break your fingers with my strength, but it dwindles, it doesn't stay.

Gwinner Dep., Ex. H 66:18-24, 67:1-6.  And while Ms. Gwinner stated that she is able to ride her bike, she also stated that when she is finished her hands are numb.  Id. at 67:23-24.  When viewing Ms. Gwinner's statements in their entirety, it appears they are supportive of the proposition that the injuries suffered to her wrist are permanent within the meaning of AICRA, especially because, as of the deposition date, May 16, 2011, Ms. Gwinner's right wrist had not healed to function normally.

In conclusion, the Court finds Ms. Gwinner has provided evidence sufficient to demonstrate injuries suffered to her right wrist were permanent and caused by the accident in question.  Because Plaintiff need only demonstrate one of her injuries, if proven, satisfies AICRA's limitation-on-lawsuit threshold, and she has done so, the Court will allow all of her noneconomic claims to go to a jury.

**CONCLUSION**

For the reasons set forth above, Defendant's motion for summary judgment shall be denied. The accompanying Order will be entered, and the case will be scheduled for trial.

__August 2, 2012__
DATE

__s/ Jerome B. Simandle__
JEROME B. SIMANDLE
Chief U.S. District Judge